## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **LUIS O. BARRIONUEVO** : | |
| : | |
| **v.** : | **Case No.:** 22-cv-60619 |
| : | |
| **PRINCIPAL LIFE INSURANCE COMPANY,** : | |
| **an Iowa corporation, PRINCIPAL NATIONAL** : | |
| **LIFE INSURANCE COMPANY, an Iowa** : | |
| **Corporation AND PRINCIPAL SECURITIES,** : | |
| **INC., an Iowa corporation** : | |

## COMPLAINT AND JURY DEMAND

Plaintiff,  LUIS O. BARRIONUEVO, by and through his undersigned counsel, files the following Complaint for damages and other equitable relief for Defendants' violations of law. Plaintiff states the following as his claims against Defendants:

### PRELIMINARY STATEMENT

1.      This is an action for damages, declaratory judgment, attorneys' fees and other relief on behalf of Luis Barrionuevo, a former employee of Defendants, Principal Life Insurance Company, Principal National Life Insurance Company, and Principal Securities, Inc. (collectively "Defendants" or "Principal") who was subjected to unlawful discriminatory employment practices based on discrimination and retaliation on the basis of race, color, national origin, age and retaliation for reporting same.

2.      This action arises under  Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 (e), et seq., as amended by the Civil Rights Act of 1991 at 42 U.S.C. §1981  ("Title VII"), the Age Discrimination in Employment Act 29 U.S.C. §§621 to 634 ("ADEA") and the Florida Civil Rights Act of 1992, Fla. Stat. §§ 760.01 – 760.11 (2013) ("FCRA").

**JURISDICTION AND VENUE**

3.      The jurisdiction of this Court is invoked, and venue is proper in this district, pursuant to 28 U.S.C. §§ 1331 and 1391 as Plaintiff's claims are substantively based on Title VII and the ADEA.

4.      The supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1367 to consider Plaintiff's state law claims under the FCRA.

5.      The unlawful practices described hereinafter have been committed in the Southern District of Florida.

6.      All conditions precedent to the institution of this suit have been fulfilled and Plaintiff has satisfied all jurisdictional prerequisites to the maintenance of this action. On December 30, 2021, a Notice of Right to Sue was issued by the Equal Employment Opportunity Commission and this action is filed within ninety (90) days of receipt of said Notice.

**PARTIES**

7.      Plaintiff, Luis O. Barrionuevo (hereinafter "Plaintiff" or "Barrionuevo"), is a 64-year-old, Hispanic, brown-complexioned Latino individual of Cuban ancestry, who at all times relevant resided in, and is a citizen of, the State of Florida.

8.      Defendant, Principal Life Insurance Company, is a corporation duly organized and existing under the laws of the State of Iowa, maintaining a place of business in this judicial district at all times relevant.

9.      Defendant, Principal National Life Insurance Company, is a corporation duly organized and existing under the laws of the State of Iowa, maintaining a place of business in this judicial district at all times relevant.

10.     Defendant, Principal Securities Inc., is a corporation duly organized and existing under the laws of the State of Iowa, maintaining a place of business in this judicial district at all times relevant.

11.     At all times relevant hereto, the Defendants acted through their agents, servants, and employees, who were acting within the scope of their authority, course of their employment, and under the direct control of Defendants.

12.     At all times material herein, the Defendants are and have been a "person" and "employer" as defined in the ADEA, Title VII, and FCRA and are accordingly subject to the provisions of each said Act.

### FACTS COMMON TO ALL COUNTS

13.     Barrionuevo, was employed by Principal as a Regional Managing Director ("RMD") for 18 years. He was discriminated and retaliated against, and constructively discharged due to, inter alia, discrimination based on, retaliation, race, color, national origin, and age discrimination.

14.     At all relevant times during his employment with Principal, Barrionuevo was an exemplary employee and performed his job duties in a satisfactory manner. Any reason that may subsequently be given for his discharge is  pretext for discrimination.

15.     Because Principal allowed the discrimination and retaliation to continue unabated, Barrionuevo was discharged from his employment on April 20, 2021.

16.     Principal engaged in discriminatory and retaliatory conduct toward Barrionuevo, who is Hispanic, including, but not limited to, reducing his pay, withholding owed compensation, , interposing unfair and unfounded allegations of poor performance, and unreasonable disciplinary procedures and actions against Barrionuevo.  Principal also demoted Barrionuevo in favor of a white male, who thereafter usurped Barrionuevo's role and responsibilities at the workplace, and undermined Barrionuevo's relationships with his agents.

17.     As detailed herein, Barrionuevo continually reported Principal's disparate discriminatory treatment toward Hispanics and demanded corrective action and investigations. However, Principal failed and refused to undertake any corrective measures, opting instead to retaliate against Barrionuevo and continue its pattern and practice of discrimination.

18.     Principal's own internal documents define constructive discharge as:

> "a constructive termination shall mean a termination of employment by the Employee within 120 days following a material reduction in the Employee's base salary or an Employee's incentive compensation opportunity, a material reduction in the Employee's responsibilities, or relocation of the Employee's principal place of employment is a location 50 miles or more away from Employee's prior place of employment."

19.     Barrionuevo, Principal's sole Hispanic RMD, was subjected to actions resulting in all of the scenarios that define a constructive discharge, and all such conduct was predicated on discriminatory and retaliatory basis.

20.     Principal, through numerous senior personnel, set upon a shocking and long-standing course of conduct to discriminate and retaliate against Barrionuevo by demoting him in favor of less-qualified, younger, non-Hispanic personnel, decreasing his pay, interfering with, and

undermining, his management of Principal's South Florida Business Office and its agents, issuing unsupportable "written warnings", refusing to provide necessary managerial support (while treating other non-Hispanic Regional Managing Directors and Senior Regional Managing Directors differently). Principal also inappropriately and unlawfully discriminating against Barrionuevo in terms of his position, pay, and performance evaluations based on his race/ethnicity, as well as on his age, by promoting and providing higher compensation to younger non-Hispanic personnel, by defaming Barrionuevo to his advisers and others in the industry, and by creating ethics issues through Principal placing unlicensed individuals and offices under Barrionuevo's "supervision" without his knowledge or consent, and in violation of FINRA and SEC regulations.

21. This not only resulted in unlawful retaliation, discrimination, and withholding of compensation, but also in the constructive discharge of Barrionuevo by reducing his pay, withholding owed compensation, demoting him by usurping his title, role, responsibilities, and relationships with his agents, interposing unfair and unfounded allegations of poor performance, and unreasonable and threatening disciplinary procedures and actions against Barrionuevo.

22. Ironically, Principal's discrimination and harassment policy states "We believe in treating each other with respect and dignity, and in fostering an atmosphere of open communication, trust and mutual respect. We expect that all work relationships will be free of bias, discrimination, harassment, and retaliation."

23. There are several ways in which Principal has engaged in disparate treatment of Barrionuevo and Hispanics.

24. Barrionuevo, Hispanic and age 64, is in several protected classes under Title VII, the ADEA, and the FCRA. It is apparent that many of the decisions that have been made by

Principal over the years with respect to Barrionuevo are a direct result of an underlying bias based on age, color, race and national origin and in retaliation for reported the discriminatory conduct.

25.     Since Barrionuevo began with Principal 18 years ago, he has been the only minority in the role of RMD and has received more than his share of disparaging comments and treatment.

26.     Based on the matters discussed below,  Barrionuevo was discriminated against based on his age, race, color, ethnicity, and retaliated against for engaging in protected activity, subjected to fraudulent misrepresentations that he relied on to his detriment, had wages unlawfully withheld by Principal, had his professional reputation damaged by defamatory comments, and suffered damages due to Principal's breach of contract.

27.     Barrionuevo is owed certain restricted stock units that, but for Principal's direct discrimination, retaliation, and fraud, he would have received.

28.     Barrionuevo was recruited by a headhunter while at MetLife to join Principal in December of 2003.

29.      In conversations with Bob Duncan (the Vice President at Principal that recruited Barrionuevo), Mr. Duncan conveyed on behalf of Principal, a promise that Barrionuevo  was to be given a guaranteed wage for two years—there was no mention of his pay being a draw.

30.     It was not until after he was already employed by Principal that Barrionuevo learned that it was indeed a draw and that he could accrue a negative balance. Interestingly, Mr. Duncan retired from Principal just two months after Barrionuevo joined Principal.

31.     After the first year, the guarantee turned out to be a draw based on a formula that rendered it nearly impossible to achieve maximum compensation.  Based on those criteria, Barrionuevo would have to grow production and first year commissions on insurance products

from the South Florida Office by 125% year over year. This was never mentioned by Mr. Duncan. It was not until 2008 that Barrionuevo was able to clear the debit balance.

32.     After fraudulently inducing Barrionuevo to join Principal, Principal engaged in a continuing scheme to defraud Barrionuevo by unlawfully and unfairly imposing a "debit balance" repayment scheme requiring that Barrionuevo pay back a debit balance from the compensation plan where it was accrued but then limited his ability to generate sufficient compensation based on production and first year commissions on insurance products and gross commissions over the prior year in order to repay the debit balance, as Principal completely controlled the compensation results.

33.     Principal unilaterally decided to completely change the compensation plan in 2018 that Barrionuevo was subjected to. The Regional Managing Director Compensation Plans prior to 2018 provide no such basis for such a recovery

34.     Under the new plan, the ability to reduce the debit balance was very limited since it was not formula driven anymore but, rather, involved a very low base salary which was subjectively determined by Principal and varied between the different RMD's, with the potential to obtain bonuses by hitting certain goals as set by Principal --usually with the  bonuses bearing a relationship to the base pay. In this change, rather than eliminating the debit balances, Principal just reduced it and put everyone on an annual payment plan to repay the debit balances over a 5-year period.

35.     Principal's decision in 2018 to lower Barrionuevo's base salary to $144,000 for calendar year 2019 made it nearly impossible for him to achieve a level of compensation consistent with representations previously made to him (and that would clear the alleged debit balance).

36.     Principal's unilateral and baseless directive to "recover" a prior alleged "debit balance" from Barrionuevo was improper at best and fraudulent at its core. Not surprisingly, but more relevant here, Principal failed to enforce the debit balance recovery plan uniformly.

37.     At least one employee, Kimberly Etchings ("Etchings"), who is White, owed a substantial amount in alleged "debit balances"; however, Principal waived collection of her debit balance.

38.     After he was forced to take a reduction in position and pay, Barrionuevo reported the disparate treatment and inconsistent enforcement of the debit balance payment plan. Barrionuevo requested that Principal waive the remaining debit balance as it had done with other individual when their position was reduced or when they were promoted, only to be told that Principal would only do a recalculation of how much would be deducted monthly but that reducing the total balance was not an option in Barrionuevo's case.

39.     Ironically,, the person who Barrionuevo had to address this issue with was Etchings, one of the individuals whose balance was forgiven after she received a promotion.  Of course, had Barrionuevo been treated similarly to others, such as Etchings, , the debit balance would have been waived.  Such disparate and unequal enforcement  evidences a portion of Principal's unlawful conduct and retaliation.

40.     Principal represented to Barrionuevo that the potential for Barrionuevo's compensation as Barrionuevo grew the South Florida Business Office was unlimited. These representations induced  Barrionuevo, to his detriment, to spend thousands of dollars of his own money, to develop business and recruit on behalf of Principal.  Barrionuevo relied on Principal's representations that his personal expenditures would result in greater compensation.  Relying on Principal's representations,  Barrionuevo consistently spent his own funds to pay for expenditures

used to grow the office, such as bringing in a Training Director to train new agents in the expectation that trained agents would generate additional production and first year commissions on insurance products, only to have Principal again change its compensation plan to eliminate the potential compensation upside and at the same time creating the alleged "debit balance". In all prior years Principal's mantra for RMD's was that the position was entrepreneurial and therefore using their own money to develop business would benefit their compensation. Had Barrionuevo known that Principal would renege on its promises, Barrionuevo would have made different decisions. Barrionuevo reasonably relied to his detriment on these fraudulent misrepresentations by Principal.

41.     During his employment with Principal, Barrionuevo posted for several internal positions to move up within the company, but he failed to receive an earnest shot at any of the positions. Rather, Principal merely went through the motions so that Principal could say it had "interviewed" its sole Hispanic manager.

42.     The first of these incidents occurred in July 2016, regarding the position of Managing Vice President.

43.      During that "interview" process, Barrionuevo engaged in extensive conversations with the Regional Vice President at the time, Jim Carbone ("Carbone"), where they discussed several strategies for how Barrionuevo could help Principal expand its reach into the Hispanic markets around the country including by aligning various offices in diverse cities with  market opportunities. After the posting had closed, Carbone indicated that he was in favor of Barrionuevo's strategic plans, and implied that he would be reaching out soon for the next steps.

44.     However, a few weeks later Carbone called and advised Barrionuevo that, although he was Hispanic and well-qualified for the position, Principal had decided to go in a different direction.

45.     Apparently, Nick Cecere ("Cecere"), Senior Vice President – US Insurance Solutions Distribution, had decided that Principal would promote Etchings who had only been with the company a few years, is White and offered no experience or knowledge related to opening Hispanic markets.  Moreover, it was apparent that Etchings was not more qualified for the position for other reasons as well.  In the few short years Etchings had been with Principal, she had already accrued a large debit balance due to her performance in the business center, she did not have all the licenses required for her position, she did not have any preferred designations for someone in her position, and she had not qualified for the company's Managing Achieving Round Table ("MART") awards..

46.      In contrast, Barrionuevo had all the required licenses, had the CHFC, CLU, CLF and LUTCF designations, qualified for MART seven times and had been with the company for 13 years. Additionally, he is Hispanic and fully bilingual offering a natural fit in providing Principal with an opportunity to expand into the Hispanic markets.

47.     The contrast in qualifications for the position between Etchings and Barrionuevo could not be more striking:

**Etchings**                                          **Barrionuevo**

YTD GDC production 807,371                YTD GDC production 2,056,604

Prior 3-year production total 678,017     Prior 3-year production total 3,184,871

Been with Principal a short time             Been with Principal for 13 years

| | |
|---|---|
| No MART qualifications | Seven MART qualifications |
| No industry designations | CLU, ChFC, LUTCF and CLF designations |
| Did not have all the required licenses | Has all the required licenses for over 15 years |
| Never served on advisory council | Served on the company advisory council |

48.     In 2018, Principal created six Senior Regional Managing Director positions. Initially, Principal intended to not post for the positions, however then elected to post the positions for five days.  When Barrionuevo first tried to apply, he was blocked from submitting his application  and received a response that he was not qualified, even though he, in fact, was qualified.  After discussion with Barrionuevo, Principal permitted him to apply for one of the positions.

49.     Barrionuevo then was permitted to apply through the HR system and was informed that an interview would be scheduled.

50.      At that interview, which consisted of three leaders (Candy Bidler ("Bidler"), Etchings, and Jon Anonson),  Barrionuevo was asked why he thought he was a good candidate for the position.  In response, Barrionuevo tried to engage the leaders with all the strategic plans he had discussed in an interview he had with Carbone for a different position he also was not earnestly considered for.   However, the panel had nearly no follow up questions and were disinterested, indicating the interview was mere window dressing.

51.     Not surprisingly, Barrionuevo did not receive a second interview with other leaders. The only explanation provided by Principal was a pretextual excuse which purportedly related to

Barrionuevo's production.  However, the excuse had no basis.  Barrionuevo's production was not at issue, as evidenced by the fact that Barrionuevo had qualified for MART in recent years.

52.     Principal awarded all six of the Senior RMD positions to younger, White males -- seemingly the real factors used for promotion at Principal.  Barrionuevo is, of course, Hispanic. All the newly appointed Senior RMDs were also younger than Barrionuevo.

53.     More to the point, here is an overview of the individuals eventually chosen for the positions:

> a) Daniel Buehrle - Was given, but did not develop, the already successful Wisconsin business center when he was promoted ; has had several issues with HR; has no designations; and has fewer MART qualifications than Barrionuevo.
>
> b) John Hoffman - Was given, but did not develop, the already successful Minnesota business center when he was promoted after the prior Regional Managing Director was terminated for an issue with a female advisor; had been reprimanded numerous times for being intoxicated at conferences and missing or showing up late to meetings the next morning; only had a CLF designation;  and had fewer MART qualifications than Barrionuevo.
>
> c) Douglas DiDominica - Owned his own broker-dealer prior to coming to Principal. He closed his business and brought all his advisors over –as opposed to recruiting new advisors. DiDominica had no designations; and fewer MART qualifications than Barrionuevo.
>
> d) Philip Pyrz - Was given, but did not develop, the already successful North Texas business center and then they merged with another business center. Pyrz had issues with tardiness and missing meetings due to excessive drinking the previous night; as his CLF designation but fewer MART qualifications than Barrionuevo.
>
> e) Scott Krueger - Was given, but did not develop, the largest agency in the company. Krueger's brother is a VP with the company for many years; has fewer MART qualifications than Barrionuevo and has no designations.
>
> f) Shawn Will - Will came to Principal and was given the Carolinas business center, which he had not developed, when he joined Principal about seven years ago. Will has fewer MART qualifications than Barrionuevo and no designations.

54.     By comparison, Barrionuevo's qualifications are as follows:

a)   took over the South Florida business center in December of 2003 when it only had five advisors and did $391,000 in production for the entire year;

b)   grew the organization to over 45 advisors doing over $4,200,000 in production by 2019;

c)   qualified for MART eight times;

d)   had the ChFC, CLU, CLF and LUTCF designations for many years;

e)   qualified for top industry awards at the top levels for 16 consecutive years;

f)   was on the Field Leaders Advisory Board from 2010-2014;

g)   is fluent in both English and Spanish;

h)   had the most diverse organization at Principal;

i)   was the RMD with the most years of experience in the position at Principal; and,

j)   has been a speaker at the LAMP industry meeting.

55. Notwithstanding these facts, Principal chose to promote only WHITE employees, younger than Barrionuevo, even when some did not have all the required licenses and others had had HR issues (Barrionuevo had had no HR or compliance issues in the 15 years that he had been with Principal).

56.   Despite meeting or exceeding all the required qualifications of the posted positions, and being far more qualified than  other applicants, Barrionuevo was neither granted a second interview nor promoted..

57.   Barrionuevo even had noted for Bidler that he possessed all the qualifications they were looking for in the posting for the position and could bring to the role with his diverse

background to penetrate additional markets. Bidler, like Etchings, failed to possess all of the licenses required for her position.

58. As such, it is beyond dispute that 1)  Barrionuevo had the most designations from all the applicants which was stated on the job posting as a desired qualification, and 2) is the only Hispanic/minority on the list of all the available candidates.

59. There are additional incidents of unequal treatment relating to the licensing requirements of two managers that Barrionuevo wanted to hire in 2018 and 2019 - - one was Hispanic and the other African American.  Both applicants were  missing a license or two.  However, there had been numerous situations where managers were hired and given a few months to obtain the requisite licenses—though those managers appear to be White.

60.    Barrionuevo was not allowed to appoint the managers unless and until they had all their licenses although, on information and belief, there are internal Principal reports that list the managers around the country who were already appointed but were still missing some licenses.  One, in fact, was a White RMD-- George Follstad – who was missing licenses for many years.

61.    Through the years, dealing with Principal's underwriting department was also a constant battle for Barrionuevo and his agents, as any potential Hispanic client from South Florida was scrutinized more than other similar, non-Hispanic clients.

62.    When Barrionuevo first joined Principal in 2003, it would not insure anyone that traveled to any Latin American country.  This created enormous issues for the agents selling life insurance in South Florida.

63.    However, around 2006 a law was passed in Florida that prohibited insurance companies from declining policies based on or due to travel which stemmed the obvious underwriting bias inside Principal—to a certain extent.

14

64.     It appears, however, that the anti-Hispanic dogma runs deep inside Principal as there were still issues with Principal merely changing from barring underwriting of policies due to travel to not allowing any transaction to be conducted in Spanish or not providing any translation services.

65.     Principal's motto appears to be "If at first you don't succeed at being discriminatory, then try harder." It also would not approve any policies on clients who lived in Latin American countries even though other companies, like Prudential, facilitated these sales. In fact, there have been numerous issues with  Mindi Sauer ("Sauer") and her associate Lea Goodrich ("Goodrich") in underwriting with regards to Hispanic agents and clients.

66.     Around 2007, because of a surge in life insurance sales, the underwriting department endeavored to hire over 50 new underwriters.

67.     Barrionuevo asked Sauer and Goodrich if they could try to hire someone, at least one person, out of that 50 that could speak Spanish so they could translate documents and facilitate sales to Hispanics.

68.     Goodrich indicated that she was not going to be told that she had to hire someone who spoke Spanish and that she was not going to do it.

69.      About a year later, in or about 2008, the President of Principal International, Norman Sorensen ("Sorensen"), after discussion with Barrionuevo regarding the underwriting problems, proceeded to go to the underwriting department to find out why someone like him would not be considered for a policy with Principal. It appears that  Sorensen ruffled some feathers as the next day Barrionuevo received a call from Cecere telling him to not share anything further about the underwriting issue with Sorenson. To Cecere's chagrin, Sorensen would not drop the issue and proceeded to discuss it with then CEO Larry Zimpleman ("Zimpleman").

15

70.     A few months later, Sorensen and Zimpleman renegotiated with Principal's re-insurers to underwrite these clients just like other life insurers were doing.

71.     After that second that agreement was signed, however, Barrionuevo was approached by Cecere and Neal Halder (Head of Underwriting) and warned that they did not want him to "go crazy" writing business on these Hispanic clients and, in fact, they preferred if Principal did not write any such business.

72.     Principal erected further obstacles by demanding attending physician statements on most of these cases knowing that these documents would be in Spanish and needed to be translated. Underwriting then informed Barrionuevo that he had to get them translated and that he could not do it himself, even though he is fluent in Spanish, and even though these were documents that sometimes had 50 to 100 pages that cost $75 a page to translate, Principal did not care.

73.     Barrionuevo contacted Carlos Rojas ("Rojas") in Principal's International Division who had previously translated documents for underwriting  wondered why they had not asked him directly.

74.     Sauer complained to Neal Halder that Barrionuevo was trying to go above her by going to Rojas directly and that he should not be used for this. When no valid reason for prohibiting Rojas from translating was provided, Rojas was finally allowed to translate.

75.     Another incident involved a Hispanic agent, Victor Yedid ("Yedid"), who primarily writes business with Hispanic clients.  Barrionuevo received a call from Nick Krueger ("Krueger") who said that he had received a call from Sauer complaining that Yedid had been very rude to one of her underwriters, Shalyn Woerderhoff ("Woerderhoff"), and that Sauer wanted him to be fired.

76.     Barrionuevo told Krueger to give him the details of what was said but he really did not know.  Barrionuevo requested to have Yedid and Woerderhoff meet face-to-face.  Barrionuevo

and Yedid flew up to the home office in Iowa to meet and discuss the situation. The conversation went well and everything appeared to be fine after that between the two of them.

77.     However, in 2010 Barrionuevo received a call from Sauer that Yedid had been rude to someone from marketer services.  Barrionuevo asked Sauer to provide the details so that he could discuss this with Yedid immediately. Sauer indicated that she could not tell Barrionuevo what was said, but that the calls were recorded, she was going to listen to them and would get back to him.

78.     When Sauer failed to get back to Barrionuevo, he reached out to her to see if she could let him hear or have a copy of the recording so he could sit down with Yedid and address the situation.  After that second communication with Sauer, it became apparent that she did not have any facts to support her allegations and just indicated that she would "handle it."

79.     There were also two notable incidents with underwriting/Sauer and agents Alan Sanchez and Alberto Sanchez. The first one involved Sauer lying about not obtaining approvals and the second one was her declining a case because of suitability, that is, making sure that the product is a good and proper fit for the client consistent with the guidelines of FINRA and the SEC. Sauer also then suggested that the advisors send the case to  the Preferred Product Network ("PPN")  knowing that PPN would then need to send the case back to Sauer for her approval on suitability, which she had already declined. Basically, she was sending the (Hispanic) agents on a wild goose chase for no reason.

80.     Sauer then tried to report the same (Hispanic) agents to compliance. Principal sent an auditor to  Barrionuevo's business center to investigate the business of both Alan and Alberto Sanchez.

81.     After much scrutiny, nothing was found to be out of line by the auditor, Cody Lawler ("Lawler"). Lawler mentioned to Barrionuevo during his visit that he was told that he "had to find something on them."

82.     Then, not being satisfied with the audit results, Lawler's boss (Violet Gesing) was sent to audit personally. Again, nothing was found to be out of line.

83.      They then tried to accuse the agents of doing excessive foreign national life insurance business, which as noted would not be against the rules. However, upon review the 77 submitted clients were not foreign nationals but, rather, most were business owners in the U.S.

84.     It is readily apparent that Principal has a pattern and practice of discrimination against Hispanics. The disdain for, and discrimination against, Hispanics and other people of color is palpable inside Principal. Although Barrionuevo qualified for many of the company's top honors and trips, he has frequently had to sit at tables at dinner by himself with his wife while individuals from corporate leadership obviously and purposely avoided sitting with them. There are even photos from a trip where all the tables are visible and packed with WHITE people, except for the table with just Barrionuevo and his wife and another table next to them with just an African American family by themselves.

85.     Further, after leading Principal in growth and coming in at #4 in the MART rankings for 2019, Barrionuevo's base compensation was only increased back to the 2018 base compensation of $152,000.

86.     In early 2020, Barrionuevo lost one of his managers who took an advisor with him to another company; however, Principal did not adjust Barrionuevo's goals for 2020 to reflect the loss of production.

87.     Then  Barrionuevo had to close the office due to the Covid-19 pandemic starting in March. Principal decided to transition the South Florida Office to its new so-called "Model Office" platform in May 2020 which disrupted business further, followed by an unusually long audit in June.

88.     Moreover, Principal would not let Barrionuevo replace the departed manager which significantly impacted the ability to continue efficiently and effectively support the office.

89.     Notwithstanding all the above unforeseen obstacles, and the utter lack of assistance from Principal, the South Florida office under Barrionuevo was able to maintain its business production ahead of the prior year well into April, until the pandemic effect took hold.

90.     After losing some advisors and dealing with the closing of the office for most of 2020,  Barrionuevo was informed, with no prior warning, that Principal had decided to merge the South Florida Office into the Tampa office thereby reducing his position to Senior Managing Director and his pay to $131,000.

91.     As part of the office merger, Principal chose to not make the more senior, experienced, productive, and qualified manager, Barrionuevo, the RMD but instead chose the White, Ron Piccinini ("Piccinini").

92.     Piccinini and his three managers had recruited fewer advisors than Barrionuevo did by himself in 2020.

93.     Piccinini also had a history in which he was terminated about five years prior for a compliance issue but then brought back.

94.     Despite being the ONLY HISPANIC RMD employed by Principal, and despite his office finishing #4 in MART in 2019,  Barrionuevo was advised that he would need to immediately accept the demotion and reduction in pay or Principal would consider that he had resigned.

95.     Barrionuevo spoke with Etchings and asked her if he accepted the position reduction, and cut in pay, would Principal cancel the debit balance as it had done for other, white, employees. Etchings responded that it had not been discussed but that she would find out.

96.      Once Barrionuevo was forced to take a reduction in position and pay, he requested that Principal waive the remaining debit balance as it had done with others when their position was reduced or they were promoted only to be told that Principal would only do a recalculation of how much it would deduct monthly but would not reduce the total balance.

97.     Barrionuevo then received a call from Stephanie Bandow ("Bandow"). Barrionuevo inquired why he was not offered some type of severance as an option but Bandow blithely stated that Principal felt that Barrionuevo was being offered a comparable position.

98.     Barrionuevo asked Bandow if Principal was intending to cancel his debit balance as it had done routinely for other, white, employees who were promoted or demoted. Unsurprisingly, Bandow had no answer so Barrionuevo indicated that that Etchings was supposed to be finding out about that.

99.     It remains unclear how an obvious and intended demotion in position and job title, coupled with reduced compensation, reporting to a less qualified, white, employee is a comparable position or why the **ONE HISPANIC MANAGER** should not receive the same consideration and treatment as **YOUNGER, WHITE** managers. Perhaps Principal just expects people of color, and older employees, to say thanks for having any position with the company at all.

100.     Actually, by its demonstrated disparate treatment toward Hispanic agents and clients in management and underwriting, and as the demoted RMD, Barrionuevo, was the ONLY HISPANIC RMD employed by Principal, Principal has shown a clear pattern and practice of discrimination against Hispanics.

101.    In late August 2020, in the middle of the pandemic, Doug DiDominica ("DiDominica")Senior Regional Managing Director decided to start micromanaging Barrionuevo with weekly accountability calls.

102.    During one of these calls, DiDominica advised that Principal was letting people hang on for too long when they were getting close to retiring and that they needed to get people out.

103.    Piccinini repeated this comment to Barrionuevo on January 26, 2021, during his first visit to the South Florida office when he advised Barrionuevo that DiDominica had told him directly that Barrionuevo was "hanging on too long" and Piccinini needed to "get him out".

104.    Ironically, a few weeks later Barrionuevo received a memo titled "Expectations with Consequences" wherein he was threatened with possible termination if certain goals were not met.

105.    The true intent of, and pretense surrounding, the threat is exhibited by the memo including figures that were not related to the South Florida Office but, rather, were from another business center. Principal's attempts to "set-up" its one Hispanic manager, Barrionuevo, were well under way.

106.    Also, in 2020, following a four-week audit, there were a couple of issues regarding another manager, Pedro Torres ("Torres"). These issues were not very serious in nature; however, they were then using this to try to terminate Torres, who was also Hispanic. Torres ended up just getting a letter of caution.

107.    Then, around August 2020, Barrionuevo noticed his supervisor DiDominica was starting to micromanage recruiting. Barrionuevo tried to explain that he had recruited five advisors

already but could not get them fully operational as the office was closed for the pandemic and they also could not go on sales appointments.

108.    Typically, annual goals were not provided until late in January and not everyone was given the same growth percentages. There was apparently no consideration or allowances for any impact on any given office's unique circumstances. As an example, the South Florida Office had a  good year in 2019 coming in number 4 overall and number one in growth in the country. However, at the end of the year one of the managers, Shawn Wooden ("Wooden"), who is an African American, resigned as he felt that he could not advance at Principal because he was Black.

109.    Barrionuevo had wanted him to be his successor when he retired. Wooden took an advisor with him to a local broker-dealer in Hollywood, Florida.

110.    Thus, the South Florida office lost four advisors between November 2019 and January 2020 which accounted for a loss of $800,000 in production that would need to be overcome in 2020.

111.    Nonetheless, Principal set Barrionuevo's  goals for 2020 as if he still had those advisors.

112.     Rather than backing out the $800,000 and properly setting a goal at a 10% increase of that number, Principal, in a clear attempt to setup failure, set it at 10% of the total counting the production for the advisors that left while still needing to replace a manager.

113.    After several emails Barrionuevo received approval a month later to replace Wooden only to have the approval pulled with the alleged rationale that Principal did not want to hire a manager until after Covid.

114.    Sadly, this did not adjust Barrionuevo's goals to be consistent.

115.     Then, the office was shut down with no access available from March until September and, in September, the lease on the Coral Gables location expired even though the new office was not ready.

116.     As such, advisors had to work from home until January of 2021.

117.     The resulting Gross Dealer Concession ("GDC") goal that Barrionuevo was given meant that he had to grow the existing organization by close to 35% in one year!

118.     Barrionuevo also lost additional income for the productive producer portion of his 2019 compensation formula since the advisors left before the end of the year even though they had already qualified as productive producers.

119.     On September 4, 2020, DiDominica again stated that the company has been "letting managers hang on too long." At one point in  the conversation, he inquired why Wooden had resigned. When Barrionuevo advised that Wooden felt that he would never have a chance to be Barrionuevo's successor because he was Black,  DiDominica's response was "That's bullshit". Barrionuevo advised that the response told him that Wooden was obviously right.

120.     Then, on October 15, 2020, DiDominica sent a memo titled "Expectations with Consequences" which was intended for the North Florida office and, in fact, did not even have any of the accurate information or numbers on it for the South Florida Office.

121.     In the Expectations section, it stated that Barrionuevo needed to have two additional experienced agent recruits by December 31, 2020.

122.     Barrionuevo had submitted numerous candidates for approval dating back to September, and even after numerous emails DiDominica would ignore the request blocking the ability to make the hires.

123.    Ironically, some of those very same candidates are now being hired after Barrionuevo was demoted and his office merged with the Tampa office.

124.    Perhaps neither ironically nor coincidentally, on April 8, 2021, Piccinini met with Barrionuevo and, during the course of that conversation, advised that Barrionuevo consider retiring or resigning.

125.    When Barrionuevo questioned Piccinini on several occasions during the conversation if they were trying to get rid of him, Piccinini would respond every time with "I would retire or resign, you don't want to have something on your U5".

126.    Not otherwise satisfied with these clearly discriminatory efforts, Principal also refused to allow Barrionuevo to promote or hire managers. This left Barrionuevo woefully understaffed as a supervisor and shockingly also being charged with alleged "oversight" of the Tampa office which failed to have properly licensed personnel, well in excess of FINRA and SEC guidelines.

127.    Despite placing the Tampa office under his "supervision" without his knowledge or consent, Principal failed and refused to include any figures from the Tampa office in Barrionuevo's figures for production, evaluation, and compensation.

128.    Similarly, Barrionuevo recently participated on a conference call with Lawler, Andrea Garrett, Ginny Otero, Piccinini, and Daryl Holton. The topic of the call was to discuss incorrect office registrations with the state of Florida. On the call Barrionuevo discovered that the Tampa office, and more specifically George Follstad ("Follstad") (previous RMD of Tampa), was listed as reporting to Barrionuevo since 2014.  Barrionuevo had never been advised of this fact, had never been instructed to supervise someone under his apparent supervision, and had not been compensated as would have been required for production by someone under his supervision.

Additional issues this scenario has created or uncovered, and that Barrionuevo reported to Principal, are as follows:

> 1-Principal attempted to circumvent rules in order to not remove Follstad from his position as RMD even though he had been threatened that he would lose his job. Nonetheless, Principal took no action to correct Follstad's issues.
>
> 2-The fact that Follstad was not properly licensed with his Series 65 should have technically prevented him from receiving any commission overrides based on advisors' sales of advisory products.
>
> 3-Princiapl, without Barrionuevo's knowledge or consent, created unreasonable and inappropriate risk to Barrionuevo since any issues with respect to Follstad's conduct or his location would have involved Barrionuevo since, on paper, it appears that the Tampa office was under Barrionuevo's supervision as a detached location.
>
> 4-Although Barrionuevo had the extra responsibility and risk, yet was neither notified, nor agreed to this arrangement, since 2014 was not compensated in any way for this arrangement involving Follstad.
>
> 5-Under the prior compensation plan there were overrides generated from 2014-2016 that Follstad received.

129.    It is similarly worth noting that Principal allowed other managers to operate without their securities licenses though they would not permit him to hire two minorities as managers until they had all their licenses. This fact was also repeatedly reported to HR. Amazingly, however, other offices with worse production figures, supervised by **White RMD's** hired individuals as managers during the same period who failed to have the required securities licenses. The disparate and punitive treatment of Barrionuevo was not even thinly disguised.

130.    In March of 2017, Barrionuevo and his then Managing Director Shannon Barrett ("Barrett"), were  issued a Letter of Caution regarding the Special Supervision of one of his Hispanic advisors, Lyda Shehadeh.

131.    The Letter of Caution stated that Barrionuevo and Barrett had not followed directions which is completely false.

132.    During the course of this issue, Etchings visited Barrionuevo's office for the first time since becoming the Managing Vice President.

133.    Barrionuevo attempted to discuss this issue with her but she was very disinterested and indicated the Letter of Caution was "no big deal" and it was just something that went in their personnel file.

134.    After persistent requests that it be removed from the personnel file because it was false, Etchings stated "honestly, it's not a big deal and sometimes you just gotta eat shit and move on".

135.    Another issue was that if a Letter of Caution would have been warranted, protocol was that it was always directed to the Supervisory Registered Representative ("SRR") assigned to supervise the advisor and not a person helping the SRR with the supervision, which in this case was Managing Director Barrett.

136.    However, in this case, both Barrionuevo and Barrett were issued Letters of Caution although a letter was never warranted.

137.    Any reasonable reading of the materials indicates that Barrionuevo's office followed the rules and protocols. This was a targeted attempt to put something into Barrionuevo's file to "build a file", as it is frequently referred to inside Principal, in order to fabricate grounds to terminate him. Once the issue was escalated to senior management, the Letter of Caution was rescinded.

138.     However,  Barrionuevo's 18 years of performance ratings, prior to the pretense-based Letter of Caution, have shown him to always have been an above average performer and the culture of the office has always been praised.

139.     Barrionuevo was excellent in recruiting having consistently grown the office.

140.     Barrionuevo was dedicated, as his performance reviews demonstrated, however, the lack of proper, constructive, and professional communication from Piccinini and DiDominica, among others, coupled with their negative activity that was well-known nationwide inside Principal, leads to the inescapable conclusion that Principal's conduct was intentional, discriminatory, hostile, and retaliatory.

141.     Principal engaged in discriminatory and retaliatory conduct toward Barrionuevo including, but not limited to, reducing his pay, withholding owed compensation, demoting him, usurping his role, responsibilities, and relationships with his agents, and interposing unfair and unfounded allegations of poor performance.

142.     In fact, none of alleged defects in Barrionuevo's performance were discussed during Barrionuevo's  reviews prior to October 15, 2020.

143.     In his 2019 review it was noted that "Lou [Barrionuevo] and his team achieved overall GDC results that exceeded goals. Productivity results were successful."

144.     If the alleged issues surrounding  Barrionuevo's performance were as significant as later implied, they would have been a major point of discussion but, in fact, they were neither discussed nor documented until DiDominica's October 15, 2020, review.

145.     As such it is clear that the review, demotion, reduction of compensation, failure to promote and the "Letter of Caution" against the SOLE HISPANIC RMD employed by Principal are all based in discrimination and retaliation.

146.    Defendants' purported reasons for its disparate treatment toward, and constructive discharge of, Barrionuevo are a pretext for discrimination.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### RETALIATION
### TITLE VII

147.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the paragraphs above.

148.    During all relevant times herein, Plaintiff and Defendants were "eligible employee" and "employer" respectively, for the purpose of the definitions set forth in 42 U.S.C. § 2000e.

149.    Title 42 U.S.C. § 2000e-3(a) provides that it is unlawful for an employer "to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

150.    Plaintiffs made informal and formal complaints to Defendants' agents and employees opposing Defendants' unlawful, discriminatory employment practices based on national origin, race, color, and age.

151.    As a result of Plaintiff's complaints, Defendants' agents and employees took adverse actions against Plaintiff, including, but not limited to, reduction of pay, demotions, failure to promote, issuing disciplinary warnings, threats of termination,  and reprimands by supervisors.

152.    Defendants' adverse actions constituted retaliatory workplace harassment.

153.    Defendants' retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

28

154.    By its conduct, the Defendants violated 42 U.S.C. § 2000e-3. Defendants committed unlawful employment practices when they retaliated against plaintiff for his efforts to oppose practices reasonably believed to be prohibited by Title VII, in violation of Title VII, 42 U.S.C. § 2000e-3(a).

155.    As the direct and proximate result, Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits. Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights and remedies at law provided by Title VII and 42 U.S.C. § 1981a, including actual damages, compensatory damages, punitive damages, and attorneys' fees.

156.    As a direct and proximate result of the Defendants' conduct, Plaintiff has suffered a loss of income, emotional distress, and other damages in an amount in excess of $75,000.

**SECOND CAUSE OF ACTION**
**NATIONAL ORIGIN DISCRIMINATION (DISPARATE IMPACT)**
**TITLE VII**

157.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the paragraphs above.

158.    Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer, "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely

affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

159.    Plaintiff believes and thereon alleges that Defendants' policies and/or practices had an adverse and disproportionate impact on him because of his national origin.

160.    Defendants' policies and/or practices were neither manifestly job-related nor consistent with business necessity.

161.    Less discriminatory alternatives existed to achieve Defendants' stated business purposes.

162.    As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

163.    Plaintiff has made informal and formal complaints to Defendants' agents and employees opposing Defendants' unlawful, discriminatory employment practices based on national origin.

164.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on national origin.

165.    Plaintiff is entitled to his reasonable attorneys' fees and costs of suit.

**THIRD CAUSE OF ACTION**
**NATIONAL ORIGIN-BASED DISCRIMINATION (HOSTILE WORK**
**ENVIRONMENT)**
**Title VII**

166.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the paragraphs above.

167.    Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer, "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

168.    Plaintiff was subjected to harassment by Defendants' agents and employees, because of his national origin.

169.    Plaintiff was subjected to verbal and written conduct, as well as demotion and pay reductions by Defendants' agents and employees.

170.    The conduct of Defendants' agents and employees was not welcomed by Plaintiff.

171.    Defendants' agents' and employees' conduct was undertaken because of Plaintiff's national origin.

172.    The conduct was so severe or pervasive that reasonable persons in Plaintiff's position would find his work environment to be hostile or abusive.

173.    Plaintiff believed his work environment to be hostile or abusive as a result of Defendants' agents' and employees' conduct.

174.    Management level employees knew, or should have known, of the abusive conduct. Plaintiff provided management level personnel with information sufficient to raise a probability of national origin harassment in the mind of a reasonable employer. Moreover, the harassment was so pervasive and open that a reasonable employer would have had to have been aware of it. Indeed, management level employees were themselves complicit in the abusive conduct.

175.    Defendants did not exercise reasonable care to prevent harassment in the workplace on the basis of national origin and did not exercise reasonable care to promptly correct any harassing behavior that did occur.

176.    As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

177.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on national origin.

178.    Plaintiff is entitled to his reasonable attorneys' fees and costs of suit.


**FOURTH CAUSE OF ACTION**
**RACE DISCRIMINATION**
**TITLE VII**

179.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the paragraphs above.

180.    Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer, "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely

affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

181.    Plaintiff has been the victim of unlawful discriminatory conduct in the workplace. Plaintiff was unlawfully subjected to disparate treatment and suffered adverse employment actions by defendants on the basis of his race. These employment actions were unlawful in violation of Title VII, 42 U.S.C. § 2000e-2(a).

182.    Plaintiff believes and thereon allege that Defendants' policies and/or practices had an adverse and disproportionate impact on him because of his race.

183.    Defendants' policies and/or practices were neither manifestly job-related nor consistent with business necessity.

184.    Less discriminatory alternatives existed to achieve Defendants' stated business purposes.

185.    As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

186.    Plaintiff has made informal and formal complaints to Defendants' agents and employees opposing Defendants' unlawful, discriminatory employment practices based on race.

187.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on race.

188.    Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of respondent's violation of his civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights

and remedies at law provided by Title VII and 42 U.S.C. § 1981a, including actual damages, compensatory damages, punitive damages, and attorneys' fees.

### FIFTH CAUSE OF ACTION
### RACE DISCRIMINATION
### FLORIDA CIVIL RIGHTS ACT

189.   Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the paragraphs above.

190.   The subjection of plaintiff to disparate treatment and adverse employment actions by defendants on the basis of his race also violated the FCRA. Fla. Stat. §760.01-760.10.

191.   Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of respondents' violation of his civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights and remedies at law provided by the FCRA, including actual damages, compensatory damages, treble damages, punitive damages, a civil penalty and attorney's fees.

192.   Plaintiff seeks all applicable rights and remedies provided by the FCRA, including, but not limited to, recovery of actual damages, compensatory damages, treble damages, punitive damages, civil penalties, interest, costs, disbursements and attorneys' fees.

### SIXTH CAUSE OF ACTION
### AGE DISCRIMINATION
### ADEA

193.   Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the paragraphs above.

194.    The subjection of Plaintiff to disparate treatment and adverse employment actions by Defendants in whole or substantial part because of his age was in violation of the ADEA, 29 U.S.C. §623(1).

195.    Plaintiff believes and thereon alleges that Defendants' policies and/or practices had an adverse and disproportionate impact on him because of his age.

196.    Defendants' policies and/or practices were neither manifestly job-related nor consistent with business necessity.

197.    Less discriminatory alternatives existed to achieve Defendants' stated business purposes.

198.    As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

199.    Plaintiff has made informal and formal complaints to Defendants' agents and employees opposing Defendants' unlawful, discriminatory employment practices based on age.

200.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on age.

201.    Defendants' violation of the ADEA was willful and Plaintiff seeks liquidated damages for each violation.

202.    Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of defendants' violation of his civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights

and remedies at law provided by the ADEA, 29 U.S.C. § 2l 6(b) including actual damages, compensatory damages, liquidated damages, and attorneys' fees.

## SEVENTH CAUSE OF ACTION
## AGE DISCRIMINATION
## FCRA

203.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the paragraphs above.

204.    The subjection of Plaintiff to disparate treatment and adverse employment actions by defendants in whole or substantial part because of his age was in violation of the FCRA, Fla. Stat. §§760.01-760.10.

205.    Plaintiff has been made to suffer loss of his employment, income, benefits, and job security, as the direct and proximate result of the violation of his civil rights under the FCRA. Plaintiff has also been made to suffer mental anguish, pain and suffering, embarrassment and humiliation as the direct and proximate result of the violation of his civil rights as alleged herein. Further, Plaintiff is reasonably certain to suffer these damages in the future. Plaintiff seeks all applicable rights and remedies provided by Florida state law, including, but not limited to, recovery of actual damages, compensatory damages, treble damages, punitive damages, interest, costs, disbursements and his attorneys' fees.

## EIGHTH CAUSE OF ACTION
## UNLAWFUL RETALATION
## ADEA

206.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the paragraphs above.

36

207.   Defendants committed unlawful employment practices when it discriminated against Plaintiff for his efforts to oppose age discrimination prohibited by the ADEA, in violation of the ADEA, 29 U.S.C. § 623(d). As a result of Plaintiff's complaints, Defendants' agents and employees took adverse actions against Plaintiff, including, but not limited to, reduction of pay, demotions, failure to promote, issuing disciplinary warnings, threats of termination, and reprimands by supervisors.

208.   Defendants' violation of the ADEA was willful and Plaintiff seeks liquidated damages for each violation. 29 U.S.C. § 216(b).

209.   Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of defendants' violation of his civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights and remedies at law provided by the ADEA, 29 U.S.C. § 216(b) including actual damages, compensatory damages, liquidated damages, and attorney's fees.


**NINTH CAUSE OF ACTION**
**UNLAWFUL RETALATION**
**FLORIDA CIVIL RIGHTS ACT**


210.   Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the paragraphs above.

211.   Defendants have committed unfair employment practices when it committed acts of retaliation against Plaintiff for his efforts to oppose practices prohibited by the FCRA, in violation of the FCRA, Fla. Stat.§§760.01-760.10.

212.    The FCRA makes it unlawful for "an employer, an employment agency, a joint labor-management committee, or a labor organization to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section.

213.    Plaintiff made informal and formal complaints to Defendants' agents and employees opposing Defendants' unlawful, discriminatory employment practices based on age, race, color, and national origin.

214.    Plaintiff's complaints were made reasonably and in good faith.

215.    As a result of Plaintiff's complaints, Defendants' agents and employees took adverse actions against Plaintiff, including, but not limited to, reduction of pay, demotions, failure to promote, issuing disciplinary warnings, threats of termination,  and reprimands by supervisors.

216.    As a direct, legal and proximate result of Defendants' retaliation, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

217.    Plaintiff is entitled to his reasonable attorneys' fees and costs of suit.

218.    Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of defendant's violation of his civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights and remedies at law provided by the FCRA, including actual damages, compensatory damages, treble damages, punitive damages, civil penalties and attorney's fees.

**TENTH CAUSE OF ACTION**
**COLOR-BASED DISCRIMINATION**

## TITLE VII

219.   Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the paragraphs above.

220.   Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for an employer, "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

221.   Plaintiff believes and thereon allege that Defendants' policies and/or practices had an adverse and disproportionate impact on him because of his color.

222.   Defendants' policies and/or practices were neither manifestly job-related nor consistent with business necessity.

223.   Less discriminatory alternatives existed to achieve Defendants' stated business purposes.

224.   As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

225.   Plaintiff has made informal and formal complaints to Defendants' agents and employees opposing Defendants' unlawful, discriminatory employment practices based on color.

226.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on color.

227.    Plaintiff has been the victim of unlawful discriminatory conduct in the workplace. Plaintiff was unlawfully subjected to disparate treatment and suffered adverse employment actions by Defendants on the basis of his color. These employment actions were unlawful in violation of Title VII, 42 U.S.C. § 2000e-2(a).

228.    Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of respondent's violation of his civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights and remedies at law provided by Title VII and 42 U.S.C. § 1981a, including actual damages, compensatory damages, punitive damages, and attorneys' fees.

**ELEVENTH CAUSE OF ACTION**
**COLOR-BASED DISCRIMINATION**
**FLORIDA CIVIL RIGHTS ACT**

229.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the paragraphs above.

230.    The subjection of plaintiff to disparate treatment and adverse employment actions by defendants on the basis of his race also violated the FCRA. Fla. Stat. §760.01-760.10.

231.    Plaintiff has been made to suffer mental anguish and emotional distress, loss of employment and future employment opportunities, and loss of wages and benefits, as the direct and proximate result of respondents' violation of his civil rights as alleged herein. Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights

and remedies at law provided by the FCRA, including actual damages, compensatory damages, treble damages, punitive damages, a civil penalty and attorney's fees.

232.    Plaintiff seeks all applicable rights and remedies provided by the FCRA, including, but not limited to, recovery of actual damages, compensatory damages, treble damages, punitive damages, civil penalties, interest, costs, disbursements and attorneys' fees.

233.    Defendants discriminated against Plaintiff by treating him differently from other co-workers, including in promotion and unequal wages and compensation, because of his color.

234.    Plaintiffs' color was the determining factor and/or a motivating factor in Defendants' actions.

235.    As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial. As a result of Defendants' actions, Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial. Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for discrimination at trial.

236.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on sex.

## TWELVTH CAUSE OF ACTION
## DECLARATORY RELIEF ALLEGATIONS

237.    A present and actual controversy exists between Plaintiff and Defendants concerning their rights and respective duties. Plaintiff contends that Defendants violated his rights under Title VII, the ADEA, and the FCRA. Plaintiff is informed and believes and thereon alleges that the Defendants deny these allegations. Declaratory relief is therefore necessary and appropriate.

238.    Plaintiff seeks a judicial declaration of the rights and duties of the respective parties.

**JURY TRIAL DEMANDED**

239.    Plaintiff demands a jury trial on all issues and claims triable by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment jointly and severally in his favor against Defendants as follows:

1.     For a declaration that Defendants' actions, policies, and practices as alleged herein are unlawful;

2.     For lost wages and all other compensation denied or lost to Plaintiff by reason of Defendants' unlawful actions, in an amount to be proven at trial;

3.     For compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

4.     For punitive damages in an amount to be determined at trial;

5.     For liquidated damages;

6.     For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

7.     For an order enjoining Defendants from engaging in the unlawful acts complained of herein;

8.     For reasonable attorneys' fees and costs of suit to the extent allowed by law; and

9.     For such other and further relief as this Court deems just and proper.


Dated: March 25, 2022                    Respectfully submitted,

                                         BY:   */s/ Joseph A. Osborne, Esq.*

Joseph A. Osborne, Esq.
Florida Bar No. 880043
J. Robert Bell III, Esq.
Florida Bar No. 115918
**OSBORNE & FRANCIS, PLLC**
433 Plaza Real, Suite 271
Boca Raton, FL 33432
Ph: (561) 293-2600
Fax: (561) 923-8100
josborne@realtoughlawyers.com
rbell@realtoughlawyers.com
dmonahan@realtoughlawyers.com

-AND-

Michael S. Loeffler (pro hac vice forthcoming)
Caroline K. Kwak (pro hac vice forthcoming)
**Loeffler Law Group P.C.**
1363 Shermer Road, Suite 320
Northbrook, IL 60062
847-656-9200
Michael.Loeffler@LoefflerLawyers.com
Caroline.Kwak@LoefflerLawyers.com